## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| TheMLSonline.com, Inc. and Keith Castonguay, | Civil No.:_____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| Regional Multiple Listing Service of Minnesota, Inc., Minnesota Association of Realtors, Edina Realty, Inc., Henry Brandis, John Mosey and Aaron Dickinson, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs TheMLSonline.com, Inc. ("MLSonline") and Keith Castonguay ("Castonguay") (collectively referred to herein as "Plaintiffs"), as and for their Complaint against Defendants Regional Multiple Listing Service of Minnesota, Inc. ("RMLS"), Minnesota Association of Realtors ("MNAR"), Edina Realty, Inc. ("Edina Realty"), Henry Brandis ("Brandis"), John Mosey ("Mosey") and Aaron Dickinson ("Dickinson") state and allege as follows:

### INTRODUCTION

1. This case involves the continuation of concerted, illegal efforts by officers and members of the RMLS, MNAR and Edina Realty to restrict Plaintiffs' ability to lawfully use their lawfully registered internet domain name and other long-standing and well-established internet marketing strategies. MLSonline operates an internet website, www.themlsonline.com, that enables its customers to search real estate listings over the

internet.  The RMLS is a trade association that controls access to a key resource necessary for brokers to compete in the real estate market: residential real estate listings. Plaintiffs are required to be members of the RMLS in order to obtain access to Twin Cities real estate listings provided by other RMLS member brokers and agents.

2.      Defendants formed their latest plan after the RMLS initially attempted to pass a trade industry rule ("Rule 13") that would have specifically prohibited MLSonline from using the generic phrase "mls" in its internet address, www.themlsonline.com, or face suspension of access to the database that provides real estate listings in the Twin Cities metropolitan region.  The term "mls" or "multiple listing service" is a generic phrase that is commonly understood to mean real estate listings.  Before the RMLS adopted Rule 13, several of its members voiced opposition to the practice of other brokers utilizing the internet to deliver their services and in particular to utilizing the generic phrase "mls."  Without access to the RMLS database, MLSonline would have been foreclosed from competing in the Twin Cities real estate market.  Thus, the effect of Rule 13 would have restrained competition from brokers, like the MLSonline, who use the internet to more efficiently and cost effectively serve home sellers and buyers, and erected barriers to entry by other brokers in this market.

3.      In response to the rule, MLSonline. and its founder, Keith Castonguay filed an antitrust lawsuit and motion for immediate injunctive relief against the RMLS with this Court in 2006, captioned as *TheMLSonline.com, et al. v. Regional Multiple Listing Service of Minnesota, Inc.*, No. CV-06-3553 (DWF/JJG).  The RMLS promptly settled that lawsuit and rectified its illegal rule to permit MLSonline to continue to operate its

website and business.  Pursuant to the settlement, which is binding on the RMLS's directors, officers, employees and agents, the RMLS broadly released any and all claims against Plaintiffs relating to their use of the generic term "mls."

4.     Following resolution of this lawsuit, Defendants formed a new plan to eliminate Plaintiffs' ability to access real estate listings provided by the RMLS by conspiring to manipulate other trade association rules to accomplish their objective. Defendants' recent plan involves filing repetitive ethics complaints against Plaintiff Castonguay with MNAR, another real estate trade association, alleging that Plaintiffs' use of the term "mls" in their domain name and internet marketing strategies constitute violations of newly adopted "standards of practice" that attempt to restrict members' advertising practices on the internet.  Defendants' goal is to eventually have Plaintiff Castonguay's membership in MNAR suspended, which by operation of RMLS rules will also terminate MLSonline's ability to access real estate listings provided by RMLS members.  Similar to the prior plan with Rule 13, Defendants' current concerted efforts to restrain Plaintiffs' ability to use its lawfully registered domain name and permitted marketing strategies also violates federal and state antitrust laws.  In addition, their recent actions also breach settlement agreements previously reached between the parties and constitute actionable torts under Minnesota law.

5.     Accordingly, Plaintiffs file this lawsuit and seek immediate injunctive relief to halt Defendants' actions, which are part of a single, ongoing contract, combination, or conspiracy and unreasonable restraint of trade in violation of Section 1 of the Sherman Act and the state analog to the Sherman Act, Minn. Stat. § 325D.51.

## THE PARTIES

6.      Plaintiff Castonguay is a real estate agent practicing in Champlin, Minnesota.   He is the owner and president of the brokerage firm, MLSonline.   In addition, Mr. Castonguay is the owner of several domain names, including TheMLSsonline.net and TheMLSonline.org.

7.      Plaintiff MLSonline is a real estate brokerage located in Champlin, Minnesota.   It is the owner of the following domain names:   nationwidemls.com, nationwidemls.org,     nationwidemls.net,     themls-online.com,     mlsofhawaii.com, hawaiianmls.com,     mls4free.com,     themlsonline.com,     mymlsonline.com, mlsonlinemortgage.com,     mlsonlinemortgage.net,     themlsonlinemortgage.com, themlsonlinemortgage.net,     mlsonlinemortgage.org,     themlsonlinemortgage.org, mlsonlinetitle.com, themlsonlinetitle.com, mlstitle.com, mlsseattle.net, seattlemls.org, mlsseattle.org, mlsseattle.info, prelistmls.com, sellersmlsdirect.com, themlsforfree.com, themls4free.com, northwestmlsrealestatesearch.com, northstarmlsrealestatesearch.com, and themlsonline.com.

8.      Plaintiffs are members of the RMLS and MNAR, both defendants in this lawsuit.

9.      Defendant RMLS, a Minnesota corporation, is a trade association of real estate agents and brokers who practice in the Minneapolis/St. Paul greater metropolitan area.  It maintains a principle place of business at 2550 University Avenue West, St. Paul, MN 55114.  The RMLS is owned by two local realtor shareholder associations:  The Minneapolis Area Association of Realtors ("MAAR") and the St. Paul Area Association

of Realtors ("SPAAR").  The members of each local association are competitors of each other; the members of RMLS and MNAR are also competitors of each other.

10.    MNAR, a Minnesota non-profit corporation, is a business trade association of realtor agents and brokers who practice in Minnesota.  It maintains a principal place of business located at 5750 Lincoln Drive, Edina, Minnesota 55436.  Pursuant to its bylaws, MNAR has adopted the National Association of Realtor Code of Ethics (the "Code of Ethics"), which MNAR enforces against its members through its Professional Standards Committee.

11.    Defendant Edina Realty is a real estate brokerage firm that maintains a principal place of business at 6800 France Avenue South, Suite 600, Edina, MN 55435.

12.    Defendant Mosey is President of the RMLS and maintains an office located at 2550 University Avenue West, St. Paul, MN 55114.

13.    Defendant Brandis is Senior Vice President of Corporate Services at Edina Realty and maintains an office at 6800 France Avenue South, #230, Edina, MN 55435. Defendant Brandis is also currently Vice-Chair of the RMLS Board of Governors and was formerly treasurer of the RMLS Board of Governors.  He also currently sits on the Professional Standards Committee of MNAR, which is responsible for interpretation and enforcement of the Realtor Code of Ethics.

14.    Defendant Dickinson is an Edina Realty Agent and maintains an office at 11200 Commerce Drive, North, Champlin, MN 55316.  Defendant Dickinson is a member of the MNAR Governmental Affairs Committee and the MNAR Professional Standards Committee, which is responsible for interpretation and enforcement of the

Code of Ethics for MNAR.  Defendant Dickinson also sits on the Agent Advisory Committee of the RMLS and serves on the board of directors of the Minneapolis Area Association of Realtors, part owner of the RMLS.

## JURISDICTION AND VENUE

15.    This Complaint is filed under Sections 1 and 4 of the Sherman Act, as amended, 15 U.S.C. §§ 1 and 4, for damages and for injunctive relief to restrain violations by defendants of Section 1 of the Sherman Act, 15 U.S.C. § 1.  This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a).  This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims are factually interdependent with the federal law claims and form part of the same case or controversy under Article III of the United States Constitution.  Venue is proper in this district under 28 U.S.C. § 1391(b) because all defendants maintain principal places of business in the state of Minnesota.

## CONCERTED ACTION

16.    Members of the RMLS and MNAR, including Plaintiffs and Edina Realty, are competitors of each other.  Certain members of the RMLS, MNAR and Edina Realty have conspired together to manipulate and abuse trade association rules and disciplinary proceedings with the express intention to eliminate competition from Plaintiffs' competing real estate firm from competing in the Twin Cities real estate marketplace.  Specifically, Defendants have engaged in a concerted plan to file serial, duplicative "ethics complaints" against Plaintiffs with MNAR in order to have their membership in MNAR suspended.  Because the RMLS requires membership in MNAR in order to

obtain access to its database of real estate listings, Defendants' plan, if successful, will cause Plaintiffs to lose the ability to access the RMLS database for the Twin Cities real estate market.  The conspirators' manipulation and abuse of the trade association rules of RMLS and MNAR for the purpose of eliminating competition from the marketplace is a concerted action within the meaning of the Sherman Act.

## RELEVANT MARKETS

17.     The provision of real estate brokerage services to sellers of residential real property and the provision of real estate brokerage services to buyers of residential real property are relevant service markets.

18.     The concerted action complained of in this Complaint is concentrated in the geographical market defined by the thirteen county Minneapolis / Saint Paul metropolitan community and the counties in western Wisconsin bordering that metropolitan geographical area.  The geographic coverage of the RMLS establishes the outermost boundaries of the relevant geographic market.

## FACTUAL BACKGROUND

### Plaintiffs' Business Model

19.     Plaintiffs operate websites that enable their customers to search real estate listings over the internet.  These websites are easily accessed by the general public through internet searching using a generic search term, "mls."  This internet marketing strategy augments traditional marketing practices by brokers and provides an efficient means of conveying information to the public.  The use of internet marketing, including domain names that use the term "mls," and keyword advertising in which companies and

individuals have purchased the term "mls," has become ubiquitous and commonplace. For example, entering the phrase "mls" into Google yields approximately 316 million hits (i.e., websites in which the content of the website, or the domain name, or both, utilize the term "mls").   Similarly, entering the phrase "Real Estate mls" into the Google search engine yields 140 million results.

20.     Internet marketing strategies and domain names utilizing generic real estate terms such as mls are frequently used by, among others, discount real estate brokers and agents because this method of doing business is more efficient and cost-effective than other more traditional means of advertising and promotion. Plaintiffs' marketing strategies and business model are legal, promote competition and provide consumers with valuable alternatives to traditional brokerage firms.

21.     Plaintiffs were in the forefront of creative internet marketing, establishing an internet presence and developing their brand prior to their competitors.  As a result, Plaintiffs' internet business model has flourished in the Twin Cities metropolitan and western Wisconsin geographical market.  Members of the RMLS and MNAR include traditional brokers, such as Edina Realty, who are concerned about competition from internet-savvy brokers and agents.

22.     Plaintiffs' business threatens the market dominance of traditional brokerage firms such as Defendant Edina Realty.  Defendants have repeatedly voiced opposition to Plaintiffs' and other brokers' practice of using the internet to deliver their services and in particular to use of generic phrase "mls" in their domain names of their websites and in their company names.

23.     Defendants' critical weapon in their pursuit to eliminate Plaintiffs' business is the RMLS's real estate listing database—an essential resource to which all real estate agents and brokerages must have access in order to compete in the marketplace.

## The RMLS and Its Database

24.     The RMLS is run by a board of governors who are representatives from the four shareholder associations that own it and from broker participants.  Periodically, the RMLS, through its board of governors, adopts rules that govern and restrict the business practices of its constituent members.

25.     Upon information and belief, over 90% of all real estate agents and brokers in the Twin Cities metropolitan area are members of the RMLS.  In total, over 15,000 real estate agents in Minnesota and Western Wisconsin are members.

26.     The RMLS, among other things, maintains a service that provides access to a database of listings of real estate for sale in Minnesota (primarily the Twin Cities Metropolitan area) and western Wisconsin, through its NorthstarMLS system.  The database is called the NorthstarMLXchange.  This multiple listing exchange allows RMLS members to share listing information regarding real property for sale within the geographical area.  This listing information typically consists of photographs of the home or the property for sale and statistics relating to that property (e.g., sales price, square footage, year built, etc.).  The RMLS provides the only comprehensive compilation of listings in this geographical market  and all members of RMLS have access to this shared information database.

27.     In addition, the RMLS has adopted a broker reciprocity agreement.  Under the reciprocity agreement, brokers who sign the agreement may post other agents' and brokers' listings on their websites.  This allows the general public to directly access RMLS member listings over the internet.  Due to the wide acceptance of the reciprocity agreement, approximately 95% of all listings in the RMLS database are directly accessible to the public over the internet.

28.     The RMLS database information is periodically updated to the RMLS members via an IDX feed, which  is transmitted electronically to the members.

29.     In 2009, according to the website of the RMLS, more than $11 billion of real estate transaction volume was conducted through the NorthstarMLS system.  The RMLS website states:

> We give our customers access to more than 48,000 Active listings, over 1 million comparable and Sold properties, and 2.79 million property records from 87 Minnesota and 3 Wisconsin Counties.

### The RMLS Requires REALTOR® Membership

30.     According to the RMLS Rules and Regulations, participation in the service is limited to "any Realtor, who is a principal, partner, corporate officer or trustee, of a real estate brokerage firm, who holds a current, valid Minnesota or Wisconsin real estate broker's license . . . ."

31.     As indicated by use of the registered mark "REALTOR®," the RMLS restricts participation to brokers who are members of the Realtor association—it is not adequate to be licensed by the state.  In order to purchase RMLS database access, applicants must first obtain membership and pay dues to three Realtor associations.

32.     According to its website, MNAR has three tiers of membership composed of the local, state and national associations.  In order to become a member of the Realtor association, a broker is required to join all three levels of the organization.  Application to all three tiers of membership is accomplished simultaneously through application to the local association and by paying separate dues to each tier of membership.

33.     The RMLS requires that application for participation and access to its database be made to a local Realtor association—such as MAAR or SPAAR.  Once an applicant completes all steps necessary for local Realtor association membership, the RMLS will authorize the local Realtor association to provide a unique user ID and password to the member to access the RMLS electronic services including the RMLS listing database.  In addition to paying membership dues to each tier of Realtor association, RMLS members must pay separate MLS database fees.

34.     Through this organizational structure, the RMLS restricts access to its database to Realtor members of a local association, the MNAR, and the National Association of Realtors.

## Prior Lawsuits and Settlement Agreements

35.     In 2004, Edina Realty filed a lawsuit against MLSonline concerning the purchase and use of the phrase "Edina Realty" in keyword searches on internet search engines.  Defendant Brandis, who is Senior Vice President, Corporate Services of Edina Realty, was actively involved in that lawsuit for Edina Realty.  The case was resolved prior to trial through a 2006 confidential settlement agreement (the "2006 Settlement Agreement") that set forth how MLSonline could continue to use the words "Edina" and

"Realty" in future internet marketing strategies.   Pursuant to the 2006 Settlement

Agreement, the parties also executed mutual releases of claims relating to the litigation

and filed a stipulation to dismiss the lawsuit with prejudice.[1]

36.     Shortly after the parties executed the 2006 Settlement Agreement, the

RMLS, through its Board of Governors—which at the time included Defendant

Brandis—adopted a new rule, Rule 13, which prohibited any member of the RMLS from

using the phrases "MLS" and "Multiple Listing Service" either in the member's firm

name (in the case of a company) or in the website domain name (in the case of both

individuals and companies).

37.     The ostensible justification for the rule was to "protect the interest of the

local real estate industry at large" because use of MLS in member firm names and

website URLs was deemed "inappropriate, potentially misleading to consumers and

damaging to the MLS brand."   The Rule imposed a $1,000/day fine on any member

violating the Rule.   The Rule also cut off the member's access to the RMLS's property

listing database.

38.     By adopting this rule, the RMLS directly targeted Plaintiffs' business as it

is the legal owner of the trade name and URL "www.themlsonline.com."   If not

confronted, enforcement of Rule 13 as proposed by the RMLS Board of Governors would

have stripped Plaintiffs of access to the RMLS database, imposed substantial fines and

---

[1] Because the 2006 Settlement Agreement contains a confidentiality provision, Plaintiffs
have submitted the 2006 Settlement Agreement to the Court separately and will
subsequently file the document under seal pursuant to local rules.

either forced Plaintiffs out of business or forced Plaintiffs to abandon their legally registered trade name and URL.

39.   To prevent being foreclosed from the market, Plaintiffs filed an antitrust lawsuit against the RMLS seeking a temporary restraining order to enjoin the RMLS from enforcing Rule 13 captioned as *TheMLSonline.com, et al. v. Regional Multiple Listing Service of Minnesota, Inc.*, No. CV-06-3553 (DWF/JJG).   Prior to the court's ruling on Plaintiffs' motion for a temporary restraining order, the parties settled the lawsuit, executing a settlement agreement and release (the "2007 Settlement Agreement").

40.   According to the 2007 Settlement Agreement, the RMLS exempted Plaintiffs from many of the proposed requirements of Rule 13.   As a result, Plaintiffs were permitted to continue using their well-established company name, TheMLSonline.com, and URL in sponsored link advertisements appearing on internet search engine results pages.   In addition, the 2007 Settlement Agreement provided that Plaintiffs must display a disclaimer on its website stating "TheMLSonline.com is not a Multiple Listing Service (MLS)."   The 2007 Settlement Agreement did not require that the disclaimer appear in a particular font size but merely required that the disclaimer not be *de minimis* or inconspicuous.   The 2007 Settlement Agreement identified what forms of advertising were excluded from the disclaimer requirement, including sponsored link advertisements appearing on any internet search engines.   The 2007 Settlement Agreement further provided that Rule 13 did not prohibit any appearance of the phrase

MLS or the phrase "Multiple Listing Service" from appearing in the text of the Plaintiffs' websites.

41.     Defendant Mosey, as president of the RMLS, signed the 2007 Settlement Agreement on behalf of the RMLS.  The 2007 Settlement Agreement bound not just the business entities TheMLSonline.com and the RMLS but also all parents, divisions, subsidiaries and affiliated corporations and divisions as well as all "shareholders, officers, directors, employees, attorneys, assigns, representatives, successors, agents, insurers" and anyone acting of the parties' behalf.

42.     As with the 2006 Settlement Agreement, the 2007 Settlement Agreement also contained a broad release clause providing that:

> The Parties fully and finally release and forever discharge each other from any and all claims, demands, causes of action, suits, debts, charges, damages, expenses incurred in litigation, relief of any kind or nature, suits and proceedings of any kind, at law or in equity, in contract, tort or by statute, including but not limited to all rights in and to such matters that they now have, may have, or that might subsequently accrue to them (whether known or unknown), arising out of, related to, or connected with, directly or indirectly, the Lawsuit.

### MNAR's Enforcement of the Code of Ethics, Article 12

43.     According to MNAR's bylaws, MNAR adopted the Code of Ethics as part of its rules and regulations.  MNAR is responsible for enforcing the Code of Ethics and disciplining members and is governed by the Code of Ethics and Arbitration Manual of the National Association of Realtors (the "Manual").  MNAR's bylaws specifically provide that any provision of the Code of Ethics deemed inconsistent with state law shall be deleted or amended to comply with state law.

44.     MNAR enforces the Code of Ethics through committee review processes. Once a complaint is filed, the Grievance Review Committee reviews the complaint.  If the Grievance Review Committee determines that further investigation is warranted, it passes the matter on for a hearing before the Professional Standards Committee.  Under the Manual, the function of the Grievance Committee is distinguishable from the function of the Professional Standards Committee:

> The Professional Standards Committee is similar to a court. The court adjudicates matters that come before it. The Professional Standards Committee makes decisions on matters involving ethics or arbitration.
>
> If the function of the Professional Standards Committee is understood as similar to a court, the function of the Grievance Committee can then be understood as similar to that of the grand jury.
>
> …[T]he Grievance Committee receives ethics complaints and arbitration requests to determine if, taken as true on their face, a hearing is to be warranted.   The Grievance Committee makes only such preliminary evaluation as is necessary to make these decisions.

45.     The Grievance Committee does not hold hearings and does not decide whether members have violated the Code of Ethics.

46.     The Manual provides that if the Grievance Committee dismisses the complaint, the complainant may appeal the dismissal.   The Manual provides for no other circumstances under which a complainant or respondent may appeal from the decision of the Grievance Committee.

47.     Members of the association form both the Grievance Review Committee and Professional Standards Committee Hearing Panel.  The Hearing Panel is charged with the responsibility of hearing testimony and evaluating evidence from complaints

filed by the public or other members against association members for alleged violations of the code of ethics.  If the panel finds the member in violation, it may recommend one or more of the following disciplinary actions: a letter of warning or reprimand, educational courses, suspension or expulsion of membership, fines up to $5,000 and probation. All recommended disciplines by professional standards hearing panels are subject to the ratification by the association's board of directors before the discipline takes effect.

48.    Code of Ethics Article 12 was amended in 2008 to state "REALTORS[®] shall be honest and truthful in their real estate communications and shall present a true picture in their advertising, marketing, and other representations."   This general requirement is supplemented by 13 "Standards of Practice," which further define prohibited activities under Article 12.

49.    In 2007, the National Association of Realtors adopted Standard of Practice 12-10 which provides:

> REALTORS® obligation to present a true picture in their advertising and representations to the public includes the URLs and domain names they use, and prohibits REALTORS® from:
>
> 1) engaging in deceptive or unauthorized framing of real estate brokerage websites;
>
> 2) manipulating (e.g., presenting content developed by others) listing content in any way that produces a deceptive or misleading result; or
>
> 3) deceptively using metatags, keywords or other devices/methods to direct, drive, or divert Internet traffic, or to otherwise mislead consumers.

50.     In 2008, the National Association of Realtors adopted Standard of Practice 12-12 which provides:

REALTORS® shall not:

1) Use URLs or domain names that present less than a true picture, or

2) register URLs or domain names which, if used, would present less than a true picture.

51.     Neither the Code of Ethics nor the Manual provide any objective criteria on how to apply Article 12 and SOP 12-10 and SOP 12-12, including for evaluating or determining what acts in connection with the use or registration of URLs are "deceptive" or present "less than a true picture."

52.     Combined with the RMLS' requirement of membership in MNAR, these new rules provided Defendants with another means to restrict Plaintiffs' access to the RMLS database of real estate listings.  As described below, Defendants seized this opportunity by strategically filing repetitive ethical complaints with MNAR that allege Plaintiffs have violated Article 12 by engaging in the very business activities permitted by the 2006 and 2007 Settlement Agreements and which they attempted to previously curtail through the failed passage of Rule 13.

## Ethics Complaints[2]

53.     On September 20, 2010, Defendants Brandis and Dickinson filed a complaint with MNAR in which they claim that Plaintiff violated the Code of Ethics, Article 12 by using the term "MLS" in Plaintiff's business name and URL (the "2010

---

[2] Defendant Dickinson also filed a complaint against Plaintiffs with MNAR in 2008.  In it he alleged that MLSonline's purchase of his name as a keyword search term on internet search engines violated the Code of Ethics and, particularly, Standard of Practice 12-10.

Complaint").[3]  The substance of the 2010 Complaint directly related to the claims made in the 2006 Lawsuit between Plaintiffs and the RMLS, which was settled by the 2007 Settlement Agreement.  This complaint also attached as supporting evidence an email dated September 14, 2010 from Defendant Mosey, President of the RMLS, who signed the 2007 Settlement Agreement on behalf of the RMLS.

54.     Plaintiff Castonguay objected to the 2010 Complaint on several grounds, including a rule in the Manual that required any member to file an ethical complaint within 180 days after the facts constituting the matter complained of could have been known in the exercise of reasonable diligence.  Defendants knew of facts constituting their 2010 Complaint (i.e., Plaintiffs' website name) since at least the 2006 lawsuit, over three years prior to their filing of the 2010 Complaint.  As such, the 2010 Complaint should have been time-barred.

55.     After receiving the 2010 Complaint and Plaintiff's objections, Defendant MNAR instituted a bifurcated procedure not authorized by the Manual or any other rules governing the processing of ethical complaints.  Specifically, MNAR required Plaintiff to have its timeliness objection heard not by the hearing panel deciding whether he had violated the claims in the complaint, by an appeal panel convened to review the Grievance Committee's decision to forward the complaint to a hearing.  In that proceeding, Plaintiff was not permitted to a full hearing as defined by the Manual, including the opportunity to cross examine Defendants Brandis and Dickinson.  The

---

[3] The September 20, 2010 complaint also alleged that Plaintiffs violated the code of ethics by using the words "Edina Realty" in a link exchange program on the internet.

Grievance Committee's decision was given unwarranted deference not authorized under the Manual.   After the hearing panel reviewing the Grievance Committee's decision rejected the timeliness objection, the Professional Standards Committee would not allow Castonguay to argue his timeliness defense, claiming that issue had already been decided at the appeal hearing, and instructed the panel members accordingly.

56.   On February 7, 2011, a MNAR hearing panel found Castonguay in violation of the Code of Ethics, fined him $5,000, issued a three-year letter of reprimand, and required him to attend continuing education classes in the Code of Ethics and social media.  In addition, Plaintiff Constanguay's name is now listed on a MNAR webpage of "Repeat Code of Ethics Violators" which states that this violation is his second in a three-year period. Plaintiff Castonguay appealed MNAR's decision due to MNAR's failure to follow its procedural rules in considering the 2010 Complaint, but that appeal was denied on April 14, 2011.

57.   Less than three months after the appeal for the 2010 was decided by MNAR, Defendants Brandis and Dickinson filed another ethics complaint against Plaintiff Castonguay on June 30, 2011 (the "2011 Complaint").  The 2011 Complaint is identical to the 2010 Complaint and again alleges that Plaintiffs' use of the term "MLS" in their business name and URL is deceptive and misleading.[4]

58.   In his reply to the 2011 Complaint, Castonguay again stated that the complaint was untimely under the 180 day rule.  Castonguay also objected to the 2011

_____

[4] In fact, portions of the September 2010 complaint were copied verbatim and inserted into the pending complaint.

Complaint as a repetitive and unauthorized use of the ethics procedures according to Code of Ethics Article 14, Standards of Practice 14-1 and 14-4, which states that members "shall not" face multiple disciplinary hearings based on the same transaction or event and prohibits complainants from filing multiple ethics complaints based on the same transaction or events.

59.   In a letter dated August 12, 2011, MNAR responded to Casonguay's reply by indicating that MNAR will once again bifurcate his timeliness defense from the merits of the case—the exact same procedural maneuver MNAR orchestrated in response to the 2010 Complaint that deprived Castonguay of the opportunity to present his defenses in that proceeding.

60.   On August 16, 2011, Plaintiff Castonguay responded to MNAR's August 12 letter objecting to MNAR's interpretation and application of the Manual as to how his defenses should be heard.  Castonguay included in his letter a detailed recitation of the applicable Manual rule that only allows for appeals of Grievance Committee decisions dismissing the complaint and demanded MNAR identify what rule(s) gave it the authority to create an appeal hearing process to review his timeliness defense.

61.   On August 23, 2011, MNAR responded by email to Castonguay's August 16 letter confirming its planned course of action—that the hearing was going to be bifurcated with the first hearing only related to the timeliness of the complaint (in form of an appeal of the Grievance Committee's decision to forward the complaint for a hearing on the merits and no opportunity for cross examination of the complainants) and the second hearing focusing on the "substantive" matters addressed in the complaint.  MNAR

cited no rules to support its bifurcated procedure.  An initial hearing for the complaint has been scheduled for September 1, 2011 at 9:30 AM.

62.     Pursuant to rules, penalties for violating the Code of Ethics are cumulative. That is, the penalties for each successive violation are increasingly severe.  Repeated violation of the Code of Ethics increases the risk of suspension from or termination of MNAR membership, thereby resulting in loss of access to the RMLS listings database. This result is especially dire for Plaintiffs' business.  Plaintiff Castonguay is President and CEO of MLSonline.  According to MNAR's bylaws, if an officer of a corporation, such as Castonguay, is suspended from membership, all other officers, employees, and independent contractors associated with the suspended officer's corporation also lose Realtor association membership unless the employees or independent contractors severed their connection to the corporation and affiliate with another Realtor member in good standing.  Further, in order to maintain their access to the RMLS databases and continue to work in the real estate profession, MSLonline's agents would have to leave MLSonline and join competing firms.   Since 2001, Plaintiffs have spent significant time and resources building its company and recruiting and retaining quality real estate agents.

### MNAR Has Failed to Follow its Own Rules in Enforcing the 2010 and 2011 Ethics Complaints

63.     Under MNAR's bylaws, the responsibility of enforcement of the Code of Ethics and discipline of members is governed by the Manual.

64.     According to the Manual, a procedural requirement of any ethics complaint filed with MNAR is that it "must be filed within one hundred eighty (180) days after the

facts constituting the matter could have been known in the exercise of reasonable diligence . . . ."    This requirement is also set forth in the text of the complaint form itself, which provides:

> This complaint is true and correct to the best of the knowledge and belief of the undersigned and is filed within one hundred eighty (180) days after facts constituting the matter complained of could have been known in the exercise of reasonable diligence.

65.    Based on the established involvement of Defendants Brandis and Dickinson in prior litigation and the prior complaint against Plaintiffs, there is no question that they knew of the underlying factual allegations of both the 2010 and 2011 Complaints well before 180 days of filing the complaints.   Despite raising this rule and requesting dismissal of the 2010 and 2011 Complaints on this basis, MNAR continued to pursue the complaints against Plaintiffs.

66.    MNAR also violated its own rules by bifurcating the claim into an appeal of the Grievance Committee's decision to forward the claim on for a hearing despite it being time-barred.   The Manual only provides that if the Grievance Committee rejects a complaint, the complainant may appeal the decision not to forward the complaint on to the Professional Standards Committee.    The Manual does not provide a respondent an opportunity to appeal the Grievance Committee's decision to forward a complaint for a hearing with the Professional Standards Committee.   A respondent's defenses should be heard during a hearing on the merits of the claim during which a respondent should be afforded a full and air opportunity to cross-examine witnesses, call witnesses and present evidence in his defense.   Not only does this procedural maneuver violate MNAR rules as

provided by the Manual, it violates Plaintiffs' right to a full and fair hearing by making it impossible for Castonguay to effectively present his legitimate defenses.   With respect to the 2011 Complaint, MNAR is again taking the same impermissible action as it did in response to the 2010 Complaint, which, without a doubt, will deprive Castongauy of the opportunity to present his defenses at the ethics hearing.

67.    In addition, Article 14 of the Code of Ethics, specifically Standards of Practice 14-1 and 14-4, protect MNAR members from being subject to more than one disciplinary proceeding related to the same transaction or event.  Standard of Practice 14-1 provides:

> REALTORS® shall not be subject to disciplinary proceedings in more than one Board of REALTORS® or affiliated institute, society, or council in which they hold membership with respect to alleged violation of the Code of Ethics relating to the same transaction or event.

Standard of Practice 14-4 provides:

> REALTORS® shall not intentionally impede the Board's investigative or disciplinary proceedings by filing multiple ethics complaints based on the same event or transaction.

68.    Despite the fact the 2011 Complaint contains the same claims made in the 2010 Complaint, MNAR has decided to pursue to the 2011 Complaint against Plaintiffs.

69.    Furthermore, Article 12 and standards of practice 12-10 and 12-12 contain arbitrary and capricious standards that are being enforced selectively against Plaintiffs. Several Realtor members incorporate MLS in their business names and/or have registered URLs that use "MLS" in the web address and have not been penalized by the MNAR, including, but not limited to, www.FishMLS.com (website of FishMLS Realty) and

www.twinportsMLS.com.  In addition, Defendant Dickinson has registered the URL "www.edinarealtyMLS.com," which links to another website he owns— www.aaronsold.com.[5]  Many more MNAR members utilize keywords and purchase sponsored link advertising in an effort to drive business to their websites.  For example, Edina Realty has purchased sponsored link advertising that appears when searching "mls" on Google.  Edina Realty has also appeared as a sponsored link when searching "themlsonline.com" on Yahoo.  However, no other complaints alleging Article 12 violations have been filed against any other MNAR members; only Plaintiffs have been targeted.  Because of the ubiquitous usage of these common marketing devices, MNAR and RMLS members can easily conspire to target virtually any competitor with allegations of unethical conduct by filing complaints with MNAR.  This is exactly what the Defendants in this action have done.

70.    The Article 12 standards of practice are arbitrary and capricious in that they have the effect of prohibiting legal and effective marketing strategies and utterly fail to prevent the activities they aim to prohibit.  Determinations of what constitutes "deceptive use" (SOP 12-12) or "less than a true picture" (SOP 12-14) are vague and highly subjective.  The rules provide no objective guidance on what use is legitimate and what crosses the line into deceptive use.  The activities they prohibit, as enforced by MNAR,

---

[5] It should also be noted that Defendant Dickinson's registration of the URL "www.edinarealtyMLS.com" is in clear violation of RMLS Rule 13 which prohibits any use of the phrase "MLS" in web addresses that were not in effect as of March 3, 2006. The fact that Defendant Dickinson is permitted to violate the RMLS rule with impunity supports Plaintiffs' contention that Defendants' rules are enforced selectively for anticompetitive purposes.

are not only legal, but were tacitly endorsed by the National Association of Realtors as effective marketing strategies in its online publication "REALTOR® Mag."  In an article published in 2002, a monthly columnist for REALTOR® Mag recommended that REALTORS® register URLs with [yourlocation]MLS.com in their names.  Such "power domains," commented the author, would "drive business to your site."  In effect, MNAR has found Castonguay in violation of the National Association of REALTORS'® Code of Ethics for engaging in practices endorsed by the National Association of REALTORS®.  The subjective nature of these new rules and the fact that ethics hearing panels are composed of a respondent's competitors create a significant potential for abuse of the rules for anticompetitive purposes.

71.    Further, the Article 12 standards of practice utterly fail to prevent the activities they aim to prohibit.  As being interpreted and enforced by Defendants, Article 12 prohibits the supposedly "deceptive" use of the phrase "MLS" in domain names and use of keywords such as "MLS" to direct internet traffic to REALTORS®' websites.  REALTOR® association members, however, may easily circumvent this rule by partnering with non-REALTOR® member websites that engage in this very practice.  For example, "MLS.com" is the website of a real estate advertising company not affiliated with any REALTOR® that provides public access to local MLS databases, including the RMLS database.  MLS.com cannot provide the public with direct access to the RMLS database as it is not a REALTOR® or RMLS member; it can only provide access by linking its website to the websites of RMLS members.  Several REALTOR® members located in the Twin Cities metropolitan real estate market have purchased links to their

own websites from MLS.com.  In effect, a local REALTOR® association member can avoid violation of Code of Ethics Article 12 yet reap all the marketing benefits by paying a non-REALTOR member to engage in the prohibited activity for them.

72.     Based upon the evidence, it is the clear goal of Defendants' conspiracy to continue to misuse and abuse MNRA and RMLS rules through filing serial ethical complaints against Plaintiffs alleging Plaintiffs' use of MLS in its name and URL are deceptive and misleading—the same facts and events that were the subject of the 2007 Settlement Agreement—in an effort to eventually cut off Plaintiffs' ability to access MLS listings from the RMLS.  Defendants' other claims in their ethics complaint regarding use of key words "Edina" and "Realty" also violate the 2006 Settlement Agreement.  Further, the MNAR Professional Standards Committee has violated and continues to violate its own rules governing disciplinary procedures and has continuously ignored Plaintiff Castonguay's repeated requests that MNAR justify its  procedures with any of the rules in the Code of Ethics and Arbitration Manual.  By so doing, MNAR has demonstrated that it will not provide Plaintiffs with a fair and impartial hearing and will find Plaintiffs to have violated the Code of Ethics Article 12, regardless of what the evidence shows and the duplicative and abusive nature of these ethics complaints.

73.     Unless Defendants are enjoined from prosecuting this pending complaint with MNAR, Plaintiffs' business will continue to be irreparably damaged.  Plaintiffs face fines and likely suspension from MNAR.  If suspended, Plaintiffs will lose access to the RMLS database, crippling their ability to compete in this real estate market.

## COUNT I

### Unreasonable Restraint of Trade in Violation of Sherman Act, Section I
### (Against Defendants Brandis, Dickinson, Mosey, RMLS, MNAR and Edina Realty)

74.     Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 - 73 above.

75.     Defendants have conspired to file serial, duplicative and groundless complaints against Plaintiffs with MNAR in order to suspend Plaintiffs' membership in MNAR and terminate Plaintiffs' access to the RMLS listing database.

76.     Defendants' concerted efforts at manipulating RMLS and MNAR trade association rules and disciplinary procedures to eliminate Plaintiffs' competing real estate firm from the marketplace constitutes a contract, combination, or conspiracy by and between Defendants which unreasonably restrains competition in brokerage service market in the greater Twin Cities metropolitan area in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

77.     This contract, accommodation, or conspiracy has had and will continue to have anti-competitive effects in the relevant markets, including but not limited to the following:

(a)     suppressing technological innovation;

(b)     eliminating well established effective competitive business strategies;

(c)     reducing competition on price and quality;

(d)     restricting efficient cooperation among brokers; and

(e)     raising barriers to entry.

78.     This contract, accommodation, or conspiracy is not reasonably necessary to accomplish any pro-competitive objective, or alternatively, its scope is broader than necessary to accomplish any such objective.

## COUNT II

### Pendant State Law Claims
### (Against Defendants Brandis, Dickinson, Mosey, RMLS, MNAR and Edina Realty)

79.     Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 - 78 above.

80.     Minnesota antitrust law is interpreted consistent with federal courts' construction of the Sherman Antitrust Act.

81.     Defendants have conspired to file serial, duplicative and groundless complaints against Plaintiffs with MNAR in order to suspend Plaintiffs membership in MNAR and  terminate Plaintiffs' access to the RMLS listing database.

82.     Defendants' concerted efforts at manipulating RMLS and MNAR trade association rules to eliminate Plaintiffs' competing real estate firm from the marketplace constitutes a contract, combination, or conspiracy by and between Defendants which unreasonably restrains competition in brokerage service market in the greater Twin Cities metropolitan area in violation of Minn. Stat. § 325D.51.

## COUNT III

### Abuse of Process
### (Against Defendants Brandis, Dickinson, Mosey, MNAR, RMLS and Edina Realty)

83.     Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 – 82.

84.     Defendants have filed and prosecuted ethics complaints with MNAR with the ulterior purpose of using the MNAR rules and ethics proceedings to eliminate Plaintiffs competing real estate firm from the real estate market.

85.     MNAR's rules and disciplinary proceedings are not designed for members to file serial, duplicative ethical complaints against competing members for the purpose of eliminating competition from the marketplace.  Defendants' misuse of the MNAR rules and ethics proceedings, and relevant RMLS rules, therefore, constitute an abuse of process.

86.     As a result of Defendants' actions, Plaintiffs have suffered damages in excess of $75,000, the exact amount to be proven at trial.  Plaintiffs are also entitled to immediate injunctive relief halting Defendants' tortious conduct.

## COUNT IV

### Civil Conspiracy
### (Against Defendants Brandis, Dickinson, Mosey, RMLS, MNAR and Edina Realty)

87.     Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 – 86.

88.     Sometime after MNAR's adoption of Article 12, Standards of Practices 12-10 and 12-12 and before the filing of the 2010 Ethics Complaint, Defendants intentionally, knowingly and/or voluntarily combined or entered into an agreement or confederation with one another, each sharing a common unlawful purpose, or the common purpose of using unlawful means and abusing MNAR and RMLS rules and processes, to accomplish the object of eliminating Plaintiffs' competing real estate firm

from the marketplace by filing serial, duplicative and groundless complaints against Plaintiffs to MNAR, suspending Plaintiffs' membership, and thereby cutting off Plaintiffs' access to the RMLS listing database.

89.     As the direct and proximate result of the foregoing, which Defendants, acting individually, and/or through their agents or as agents of the others, knowingly and willingly conspired, combined, and agreed to promote, Plaintiffs have sustained damages in excess of $75,000, the exact amount to be proven at trial.   Plaintiffs are also entitled to immediate injunctive relief halting Defendants' tortious conduct.

## COUNT V

### Breach of Contract (2007 Settlement Agreement)
### (Against Defendants RMLS, Brandis, Dickinson and Mosey)

90.     Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 – 89.

91.     The RMLS executed a valid and enforceable settlement agreement and release with Plaintiffs.

92.     The Settlement Agreement bound the entities RMLS and TheMLSonline.com as well as their parents, divisions, subsidiaries and affiliated corporations and divisions.  The Agreement also binds the parties' officers, directors, employees, agents, representatives and anyone acting on their behalf.

93.     Defendants Mosey, Brandis and Dickinson are officers, directors, employees, agents and/or representatives of the RMLS, and are therefore bound by the 2007 Settlement Agreement.

94.     The Settlement Agreement fully and finally released and discharged the parties of any claims arising out of or any way related to the settled claims.

95.     Defendants Brandis and Dickinsons' 2010 and 2011 Complaints filed with MNAR, aided and assisted by Defendant Mosey, arise out of and are related to the settled claims and, therefore, breach the Settlement Agreement.

96.     As the direct result of Defendants' material breaches of the Settlement Agreement, Plaintiffs have suffered damages in excess of $75,000, the exact amount to be proven at trial.  Plaintiffs are also entitled to immediate injunctive relief prohibiting Defendants' conduct and compelling specific performance of the 2007 Settlement Agreement.

## COUNT VI

### Breach of Contract (2006 Settlement Agreement)
### (Against Defendants Edina Realty, Brandis and Dickinson)

97.     Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 – 96.

98.     Edina Realty executed a valid and enforceable Settlement Agreement and release with Plaintiffs.

99.     The 2006 Settlement Agreement bound the entities Edina Realty and TheMLSonline.com as well as their parents, divisions, subsidiaries and affiliated corporations and divisions.  The Agreement also binds the parties' officers, directors, employees, agents, representatives and anyone acting on their behalf.

100.   Defendants Brandis and Dickinson are officers, directors, employees, agents and/or representatives of Edina Realty, and are therefore bound by the 2006 Settlement Agreement.

101.   The 2006 Settlement Agreement fully and finally released and discharged the parties of any claims arising out of or any way related to the settled claims.

102.   Defendants Brandis and Dickinsons' 2010 and 2011 Complaints filed with MNAR arise out of and are related to the settled claims and, therefore, breach the 2006 Settlement Agreement.

103.   As the direct result of Defendants' material breaches of the 2006 Settlement Agreement, Plaintiffs have suffered damages in excess of $75,000, the exact amount to be proven at trial.  Plaintiffs are also entitled to immediate injunctive relief prohibiting Defendants' conduct and compelling specific performance of the 2006 Settlement Agreement.

## COUNT VII

### Breach of Contract, Implied Covenant of Good Faith and Fair Dealing, and Equitable Right to Fair Process
### (Against Defendant MNAR)

104.   Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 – 103.

105.   MNAR has a contractual relationships with its members by operation of its bylaws.  Pursuant to its bylaws, MNAR has adopted the Code of Ethics of the National Association of Realtors and the Code of Ethics and Arbitration Manual.

106.   MNAR has a corresponding duty of good faith and fair dealing to its members to abide by the Code of Ethics and corresponding Code of Ethics and Arbitration Manual.

107.   Minnesota law also provides that members of associations enjoy rights that will be protected by equity and due process, especially when property rights will be affected by expulsion.

108.   As described herein, MNAR has failed to comply with its own rules and contractual obligations in addressing and pursuing the 2010 and 2011 Complaints filed against Plaintiff Castonguay.   In doing so, MNAR has breached its contractual obligations owed to Plaintiffs, including its duty of good faith and fair dealing, and Plaintiffs' equitable right to due and fair process imposed by the law.

109.   These breaches were made without concern for the damages that would be caused to Plaintiffs thereby.

110.   As the direct result of Defendant MNAR's conduct, Plaintiffs have suffered damages in excess of $75,000, the exact amount to be proven at trial.   Plaintiffs are also entitled to immediate injunctive relief halting Defendant MNAR's pursuit and enforcement of the 2011 Ethics Complaint and vacating MNAR's ruling on the 2010 ethics complaint.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs pray the Court for the following relief:

1.   Awarding Plaintiffs immediate and permanent injunctive relief prohibiting Defendants from continuing their single, ongoing contract, combination or conspiracy

and unreasonable restraint of trade against Plaintiffs in violation of Section 1 of the Sherman Act, Minn. Stat. § 325D.51, and Minnesota state contract and tort laws;

2.      Awarding Plaintiffs permanent injunctive relief vacating Defendant MNAR's ruling against Plaintiffs on the 2010 Complaint and removing Plaintiff Castonguay's name from MNAR's list of repeat violators of the Code of Ethics;

3.      Awarding Plaintiffs specific performance requiring Defendants RMLS and Edina Realty, and their officers, directors, employees and other bound agents, including but not limited to Defendants Mosey, Brandis and Dickinson, to comply with the terms of the 2006 and 2007 Settlement Agreements;

4.      Awarding Plaintiffs judgment against Defendants, jointly and severally, as described herein in amount in excess of $75,000, trebled under the Sherman Act, 15 U.S.C. §§ 1 et seq., the exact amount to be determined at trial;

5.      Awarding Plaintiffs their reasonable costs and attorneys' fees, trebled, incurred in connection with bringing this action; and

6.      Awarding Plaintiffs such further relief as this Court deems just and equitable.

Dated:  August 26, 2011          MASLON EDELMAN BORMAN & BRAND, LLP


By    /s/ John R. K. Darda
       David T. Schultz  #169730
       Jason A. Lien  #28936X
       John R. K. Darda #388298
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4140
Telephone (612) 672-8200
***Attorney for Plaintiffs***

824138