## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

TheMLSonline.com, Inc. and
Keith Castonguay,

                      Plaintiffs,

                                                Civ. No. 11-2455 (RHK/SER)
                                                **MEMORANDUM OPINION**
                                                **AND ORDER**

v.

Regional Multiple Listing Service of
Minnesota, Inc., Minnesota Association
of Realtors, Edina Realty, Inc., Henry
Brandis, John Mosey, and Aaron Dickinson,

                      Defendants.

David T. Schultz, Jason A. Lien, Maslon Edelman Borman & Brand, LLP, Minneapolis, Minnesota, for Plaintiffs.

Jack R. Bierig, Sidley & Austin LLP, Chicago, Illinois, and Christopher P. Renz, Thomsen & Nybeck, PA, Bloomington, Minnesota, for Defendants Regional Multiple Listing Service of Minnesota, Inc., Minnesota Association of Realtors, and John Mosey.

Mark R. Bradford, Bassford Remele, PA, Minneapolis, Minnesota, for Defendants Edina Realty, Inc., Henry Brandis, and Aaron Dickinson.

## INTRODUCTION

In this action, real-estate agent Keith Castonguay and his brokerage firm, TheMLSonline.com, Inc. ("MLSOnline"),[1] allege that Defendants have engaged in an unlawful combination or conspiracy in restraint of trade and breached two settlement

---

[1] Although Castonguay and MLSOnline are both plaintiffs in this action, their claims are asserted jointly and their interests are aligned. Accordingly, for ease of reference, the Court hereinafter refers to them in the singular as "Plaintiff" unless otherwise noted.

agreements. Defendants are trade associations and individuals involved in the real-estate business in the Twin Cities metropolitan area. Plaintiff claims that Defendants have conspired to file multiple ethics complaints against him in an effort to ultimately cut off his access to listings and drive him out of business. Defendants have filed two Motions to Dismiss. For the reasons set forth below, the Court will grant those Motions, dismiss Plaintiff's antitrust claim, and decline to exercise supplemental jurisdiction over the remaining state-law claims.

## BACKGROUND

**I.      The parties**

Plaintiff Castonguay is a real-estate agent who works out of Champlin, Minnesota. He is the owner and president of the brokerage firm MLSonline. In 2001, Plaintiff developed a business model based heavily upon internet marketing. He operates a website, www.themlsonline.com, through which customers can search real-estate listings. In addition to this website, Plaintiff also owns a number of other domain names containing the term "mls," a common abbreviation for "multiple listing service." He uses strategies such as registering URL addresses with "mls" in their names and purchasing keyword advertising to help drive business to his website. Plaintiff was among the first in the Twin Cities market to employ these strategies, but they are not unique to him; for instance, a National Association of Realtors ("NAR") magazine recommended purchasing URL addresses containing the phrase "mls" in 2002.

Defendant Regional Multiple Listing Service ("RMLS") is operated by the Minneapolis Area Association of Realtors ("MAAR") and the St. Paul Area Association

of Realtors ("SPAAR"). It maintains a comprehensive database of real estate listed for sale in the Twin Cities area and western Wisconsin. RMLS members submit listing information and may re-post one another's listings on their websites through a reciprocity agreement. RMLS's database is the only comprehensive compilation of listings in the geographical market it serves. In order to obtain access, a real-estate agent must be a member of RMLS, which requires the agent to be licensed in Minnesota or Wisconsin and be a "Realtor," meaning the agent must not only be licensed but must also belong to the realtor association(s) for the geographical area in which that agent works. Defendant John Mosey is the President of RMLS.

Defendant Minnesota Association of Realtors ("MNAR") is a trade association of realtors who do business in Minnesota. It is part of a three-tiered system of realtor associations in the Twin Cities area, which also comprises local associations and the national association. A real-estate agent desiring to join MNAR must also join the local association (such as MAAR or SPAAR) and NAR. MNAR has adopted the NAR Code of Ethics, and it has a Professional Standards Committee in place to enforce the Code and assure compliance with its terms.

Defendant Edina Realty is a large real-estate brokerage based in Edina, Minnesota. Two of its agents, Henry Brandis and Aaron Dickinson, are also Defendants in this action. Brandis is a Senior Vice President at Edina Realty, serves as Vice-Chair of the RMLS Board of Governors, and holds a seat on MNAR's Professional Standards Committee. Dickinson is a member of MNAR's Professional Standards Committee, RMLS's Agent Advisory Committee, and MAAR's board of directors.

Members of MNAR and RMLS directly compete with one another in the real-estate market. Plaintiff is a member of both organizations, as are Brandis and Dickinson.

## II. Prior litigation

The parties to this action have been involved in previous litigation. Edina Realty commenced an action[2] against MLSonline in 2004, challenging its purchase and use of the keyword "Edina Realty" in various online search engines. Brandis was actively involved in the lawsuit on behalf of Edina Realty. The case was resolved through a confidential settlement agreement in 2006 (the "2006 Agreement"), which specifically set forth how MLSonline could use the words "Edina Realty" in future online marketing. The 2006 Agreement also contained a mutual release of claims.

Following the resolution of Edina Realty's action against MLSonline, the RMLS Board of Governors (of which Brandis was a member) adopted Rule 13, which prohibited RMLS members from using the phrases "mls" or "multiple listing service" in their firm names or website domain names because doing so could be "potentially misleading to consumers and damaging to the MLS brand." Pursuant to its terms, any member violating Rule 13 could be fined $1,000 per day and lose access to the RMLS database. Believing he had been targeted by Rule 13's adoption, Plaintiff commenced an antitrust lawsuit[3] against RMLS and sought a temporary restraining order to prevent its enforcement against him. Before the Court determined that issue, however, the parties

---

[2] Edina Realty Inc. v. TheMLSonline.com, Inc., No. 04-cv-4371 (JRT/FLN).

[3] TheMLSonline.com et al. v. Regional Multiple Listing Service of Minn., Inc., No. 06-cv-3550 (DWF/SRN).

entered into a settlement agreement (the "2007 Agreement").

Pursuant to the 2007 Agreement, Plaintiff was exempted from many of Rule 13's requirements and could continue using his established business name so long as a disclaimer was posted on MLSonline's website clarifying that the firm "is not a Multiple Listing Service."  The Agreement further provided that Rule 13 did *not* prohibit the phrase "mls" from simply appearing on Plaintiff's website.  Like the 2006 Agreement, the 2007 Agreement contained a broad release, which provided:

> The Parties fully and finally release and forever discharge each other from any and all claims, demands, causes of action, suits, debts, charges, damages, expenses incurred in litigation, relief of any kind or nature, suits and proceedings of any kind, at law or in equity, in contract, tort or by statute, including but not limited to all rights in and to such matters that they now have, may have, or that might subsequently accrue to them (whether known or unknown), arising out of, related to, or connected with, directly or indirectly, the Lawsuit.

The 2007 Agreement purported to bind not only MLSonline and RMLS, but also any affiliates, shareholders, officers, directors, employees, representatives, agents, or others acting on behalf of either party.  Defendant Mosey signed on behalf of RMLS.

**III.   Ethics complaints**

Article 12 of NAR's Code of Ethics, as amended in 2008, requires realtors to be "honest and truthful in their real estate communications" and "present a true picture in their advertising, marketing, and other representations."  Standards of Practice modify Article 12 and specifically address online representations.  Standard 12-10 provides:

> REALTORS®['] obligation to present a true picture in their advertising and representations to the public includes the URLs and domain names they use, and prohibits REALTORS® from:

5

>   1) engaging in deceptive or unauthorized framing of real estate brokerage websites;
>
>   2) manipulating (e.g., presenting content developed by others) listing content in any way that produces a deceptive or misleading result; or
>
>   3) deceptively using metatags, keywords or other devices/methods to direct, drive, or divert Internet traffic, or to otherwise mislead consumers.

Standard 12-12 further provides:

>   REALTORS® shall not:
>
>   1) use URLs or domain names that present less than a true picture, or
>
>   2) register URLs or domain names which, if used, would present less than a true picture.

Neither Article 12 nor the related Standards of Practice provides criteria for determining whether a representation is "deceptive" or "present[s] less than a true picture."

In September 2010, Brandis and Dickinson filed an ethics complaint against Plaintiff with MNAR ("the 2010 Complaint"), asserting that his use of "mls" in the name of his business and his URL violated Article 12. They also claimed that his use of the term "Edina Realty" in a link-exchange program constituted a further violation. They attached an email from Mosey to Brandis outlining statistical information about real-estate listings in Minnesota as support for their claim that Plaintiff's website falsely boasted that it contained "virtually all home listings for the greater Twin Cities area."

MNAR generally handles ethics complaints against its members using procedures set forth in an NAR Manual. The subject of a complaint is allowed to lodge objections, and Plaintiff objected to the 2010 complaint on multiple grounds, including its timeliness.

The Manual requires ethics complaints to be filed within 180 days after the complained-of facts became known or could have been known through exercise of reasonable diligence, and Plaintiff argued that Brandis and Dickinson knew his website and business name contained the term "mls" for more than 180 days before filing their complaint.

After receiving Plaintiff's objections, MNAR instituted a bifurcated procedure, which was not expressly provided for in the Manual. Specifically, it required Plaintiff to first present his timeliness objection before an appeal panel. The hearing on his objection was not a full hearing, and Plaintiff was not permitted to cross-examine Brandis or Dickinson. The appeal panel rejected Plaintiff's timeliness objection. Following this decision, the Professional Standards Committee assembled a different panel to conduct a hearing on the substance of the complaint. Plaintiff was not allowed to re-raise the timeliness issue at this hearing. The panel ultimately concluded in February 2011 that Plaintiff had violated the Ethics Code. He was fined $5,000, issued a three-year letter of reprimand, and required to attend classes on ethics and social media. Plaintiff appealed, and the appeal was denied on April 14, 2011; however, he continued to use his business name and website, and MNAR took no action to stop him from doing so.

On June 30, 2011, Brandis and Dickinson filed another ethics complaint against Plaintiff ("the 2011 complaint") making identical allegations about his use of the terms "mls" and "Edina Realty." Plaintiff again objected to the its timeliness. He also objected that it was repetitive and an unauthorized use of the ethics proceedings, based upon a rule providing that members shall not face multiple disciplinary hearings arising from the same transactions or events. In August 2011, MNAR informed Plaintiff that it intended

7

to follow the same bifurcated procedure—first resolving his objections and then addressing the substance of the allegations—as it had for the 2010 complaint.

Penalties for violating the Code of Ethics are cumulative and may become more severe with each subsequent violation. Plaintiff believes the likelihood he will be suspended (and thus lose access to the RMLS database) increases with each successive complaint. Accordingly, he commenced this action on August 26, 2011, and sought to prevent adjudication of the 2011 complaint and the filing of any additional complaints related to the same conduct.[4] Defendants have now filed two Motions to Dismiss—one by Edina Realty, Brandis, and Dickinson ("the Edina Defendants"), and the other by RMLS, MNAR, and Mosey ("the RMLS Defendants"). Both Motions assert that Plaintiff has failed to state a claim pursuant to Rule 12(b)(6) and seek dismissal of the Complaint in its entirety. The Motions have been fully briefed, the Court heard oral argument on December 20, 2011, and they are ripe for decision.

## STANDARD OF REVIEW

The Supreme Court set forth the standard for evaluating a motion to dismiss in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). To avoid dismissal, a complaint must include "enough facts to state a claim to relief that is plausible on its face." Id. at 547. A "formulaic recitation of the elements of a cause of action" will not suffice. Id. at 555; accord Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Rather, the complaint must set forth sufficient facts to "nudge[] the[] claim[] across the line from conceivable to

---

[4] Initially, Plaintiff sought a temporary restraining order. However, the parties reached a stipulation whereby MNAR agreed not adjudicate the complaint during the pendency of this lawsuit, thus mooting the requested preliminary injunctive relief.

plausible." Twombly, 550 U.S. at 570. When reviewing a motion to dismiss, the Court "must accept [the] plaintiff's specific factual allegations as true but [need] not . . . accept a plaintiff's legal conclusions." Brown v. Medtronic, Inc., 628 F.3d 451, 459 (8th Cir. 2010) (citing Twombly, 550 U.S. at 556). The complaint must be construed liberally, and any allegations or reasonable inferences arising therefrom must be interpreted in the light most favorable to the plaintiff. Twombly, 550 U.S. at 554–56.

## ANALYSIS

### I. Sherman-Act claim (Count I)

Both groups of Defendants argue that Plaintiff has failed to state an antitrust claim under Section 1 of the Sherman Act. Specifically, they argue that Plaintiff cannot show restraint of trade or harm to competition, which is the only type of injury the antitrust laws seek to remedy. Relatedly, the Edina Defendants assert that Plaintiff lacks standing because he has not pleaded a cognizable "antitrust injury."

To be a proper plaintiff in an antitrust action, one must show an antitrust injury— that is, an "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." In re Canadian Import Antitrust Litig., 470 F.3d 785, 791 (8th Cir. 2006) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)). The Eighth Circuit has held that "antitrust injury is a threshold issue that plaintiffs must establish in order to have standing to sue under the antitrust laws." Fisher v. NWA, Inc., 883 F.2d 594, 597 n.5 (8th Cir. 1989); accord Midwest Commc'ns, Inc. v. Minn. Twins, Inc., 779 F.2d 444, 449 (8th Cir. 1985) ("[A]ntitrust standing requirements go beyond injury in fact; the court must also

9

determine whether the plaintiff, even if injured, is a proper party to bring the action."). The inquiry into whether plaintiff has suffered an antitrust injury may be "dispositive." Id. at 450 ("[I]f there is no showing of injury, or if the injury alleged is not an 'antitrust injury,' the plaintiff does not have a claim cognizable under the antitrust laws.").

      Plaintiff argues that the Edina Defendants' standing argument "confuses 'antitrust injury' for the purpose of determining *standing* with the market-injury element" of a *substantive claim* under the Sherman Act. (Mem. in Opp'n 28 (emphasis added).) He relies upon decisions from several circuits distinguishing between the injury-to-competition element of a substantive Sherman-Act claim and the showing of injury required for standing. E.g., Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d 268, 275 n.2 (3d Cir. 1999) ("The District Court erred by incorporating the issue of anticompetitive market effect into its standing analysis, confusing antitrust injury with an element of a claim under section 1 of the Sherman Act."); Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc., 123 F.3d 301, 305 (5th Cir. 1997) (distinguishing between "antitrust injury and injury to competition, the latter of which is often a component of substantive liability"). The two concepts are closely related, however, and the Eighth Circuit and decisions from this District largely conflate the two and incorporate an injury-to-competition requirement into the analysis of antitrust standing. E.g., Midwest Commc'ns, 779 F.2d at 450 (noting in its discussion of antitrust injury for purposes of determining standing that "Congress enacted the antitrust laws to protect competition, not competitors"); Fair Isaac Corp. v. Experian Info. Solutions, Inc., 645 F. Supp. 2d 734, 751 (D. Minn. 2009) ("[M]erely showing that [defendant] targeted and caused injury to

10

[plaintiff] is insufficient to show an antitrust injury necessary to establish antitrust standing.").

In this Court's view, Plaintiff has at the very least failed to show injury to competition for purposes of stating a *substantive claim* under the Sherman Act. Thus, even if the standing analysis does not require a showing of injury to competition, his antitrust claim cannot survive. Section 1 of the Sherman Act declares unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. To establish such a claim, Plaintiff must show: "(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade . . . ; and (3) that the restraint affected interstate commerce." Minn. Ass'n of Nurse Anesthetists v. Unity Hosp., 5 F. Supp. 2d 694, 703 (D. Minn. 1998) (Montgomery, J.); accord Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc., 661 F. Supp. 2d 1039, 1062 (D. Minn. 2009) (Tunheim, J.). The dispute here centers on the second element, unreasonable restraint of trade, which can be established "under either a *per se* rule of illegality or a rule of reason analysis." Unity Hosp., 5 F. Supp. 2d at 703.

Plaintiff attempts to argue that he has alleged a *per se* violation of the Sherman Act. Courts have recognized that "[c]ertain types of restraint are so inherently anticompetitive that they are illegal per se, without inquiry into the reasonableness of the restraint or the harm caused." Double D Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554, 558 (8th Cir. 1998). Practices that have been deemed illegal *per se* include group boycotts, price fixing, and tying arrangements. Id. (citations omitted). Plaintiff contends

11

that he has stated a claim for a "group boycott," and thus his claim should survive the instant Motions. The Court cannot agree.

A group boycott is "a narrow category of *per se* violation, 'limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor.'" Unity Hosp., 208 F.3d at 659 (quoting FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 458 (1986)). And the category is "not to be expanded indiscriminately." Ind. Fed'n of Dentists, 476 U.S. at 458-59.[5] Plaintiff has not alleged facts regarding Defendants' "market power," nor has he suggested any attempts by Defendants to influence the behavior of customers or suppliers. Moreover, other courts to consider antitrust claims in the context of realtor-association regulations have applied a rule-of-reason analysis. See, e.g., Keller v. Greater Augusta Ass'n of Realtors, Inc., 760 F. Supp. 2d 1373, 1377 (S.D. Ga. 2011); Austin Bd. of Realtors v. E-Realty, Inc., No. Civ. A-00-CA-154, 2000 WL 34239114, at *4 (W.D. Tex. Mar. 30, 2000). In short, Plaintiff has not alleged a conspiracy constituting a group boycott.

---

[5] At the December 20 hearing on these Motions, Plaintiff advanced a definition of group boycott as "concerted action by the Defendants to deprive Plaintiff of a valuable business service they need in order to compete" and argued that he has shown such a violation. When the Court inquired about the source of this definition, counsel explained that it comes from the "Multi Realty" case (Hearing Tr. 31), referring (presumably) to United States v. Realty Multi List, Inc., 629 F.2d 1351, 1361 (5th Cir. 1980). In that case, the court quoted the following language from a 1963 Supreme Court decision involving an antitrust claim against the New York Stock Exchange: "The concerted action of the Exchange and its members here was, in simple terms, *a group boycott depriving petitioners of a valuable business service which they needed in order to compete* . . . ." Id. (emphasis added) (quoting Silver v. N.Y. Stock Exch., 373 U.S. 341, 347 (1963)). That statement, however, simply described the nature of the group boycott *in that case*; it did not define what constitutes a group boycott. Accordingly, the Court rejects Plaintiff's definition and follows the one set forth by the Eighth Circuit in Unity Hospital and derived from the Supreme Court's Indiana Dentists decision. See 208 F.3d at 659.

In the absence of a *per se* violation, an allegedly unreasonable restraint of trade must be analyzed using the rule of reason. To establish a violation under this approach, Plaintiff must show an anticompetitive effect on the relevant market. E.g., Double D, 136 F.3d at 558-59 ("This 'rule of reason' analysis involves an inquiry into the market structure and the defendant's market power in order to assess the actual effect of the restraint."); Nat'l Ass'n of Review Appraisers, 64 F.3d at 1134-35 ("In the absence of [] a *per se* violation of the antitrust laws, however . . . [o]nly anticompetitive behavior . . . is proscribed."). It thus requires a showing of harm to competition, not merely harm to an individual or business. E.g., Keller, 760 F. Supp. 2d at 1377 ("To prove an anticompetitive effect on the market, a plaintiff must either prove that the challenged conduct has 'an actual detrimental effect' on competition or that the conduct had 'the potential for genuine adverse effects on competition.'"). This reflects the long-standing principle that federal antitrust laws exist for "the protection of competition, not competitors." Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962); accord Nat'l Ass'n of Review Appraisers & Mortg. Underwriters, Inc. v. Appraisal Found., 64 F.3d 1130, 1135 (8th Cir. 1995) ("Only anticompetitive behavior, *i.e.* behavior that tends to lessen the potentiality for society to realize the benefits of the competitive process, is proscribed.").

In the Court's view, even accepting all of his allegations as true, Plaintiff has stated no claim of anticompetitive effect. At most, he alleges that he was the target of a conspiracy aimed at driving *him* out of the real-estate market. The Complaint is replete with allegations of how Plaintiff will be harmed—yet, even if these allegations are all

13

true, harm to Plaintiff does not in and of itself establish an antitrust injury. Fair Isaac, 645 F. Supp. 2d at 750-51 ("Nor does the fact that the alleged goal of the conspiracy was to 'eliminate' Fair Isaac from the credit scoring industry automatically establish injury of the type the antitrust laws are designed to protect."); accord, e.g., Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 226 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws."); Richter Concrete Corp. v. Hilltop Concrete Corp., 691 F.2d 818, 823 (6th Cir. 1982) ("Anticompetitive conduct is conduct designed to destroy competition, not just to eliminate a competitor."). Moreover, Plaintiff has not actually *been* forced out of the industry or stymied in his ability to compete. To date, the only injury he has suffered as a result of the purported "conspiracy" to file and prosecute ethics complaints against him was a $5,000 fine and reprimand following the 2010 complaint. He remains a member of the MNAR and still has access to RMLS's listings. Although a second ethics complaint has been filed, there is no indication how it will be resolved, whether it might result in his suspension, or whether any additional complaints might follow. Indeed, the 2011 complaint may be dismissed without any further consequence to Plaintiff pursuant to MNAR's rule against facing repeat hearings arising from the same events, one of the objections Plaintiff has already raised in that proceeding. In the absence of any anticompetitive effect, Plaintiff cannot state a claim for violation of the Sherman Act. Accordingly, that claim will be dismissed.

## II.     Remaining state-law claims (Counts II-VII)

Having concluded that the federal antitrust claim must be dismissed, the Court will

not reach the remaining state-law claims. The Court's subject-matter jurisdiction over this case is premised on Plaintiff's federal claim for violation of the Sherman Act; jurisdiction over the related state-law claims was invoked solely pursuant to 28 U.S.C. § 1367, which provides for supplemental jurisdiction over state-law claims that form part of the same "case or controversy" over which the Court otherwise has jurisdiction. Where all federal claims are eliminated prior to trial, the balance of factors to be considered in deciding whether to exercise supplemental jurisdiction over a pendent state-law claim typically militates against exercising such jurisdiction. E.g., Johnson v. City of Shorewood, 360 F.3d 810, 819 (8th Cir. 2004) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)). Such is the case here. Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining claims and they will be dismissed without prejudice.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motions (Doc. Nos. 18, 26) are **GRANTED**. Count I of Plaintiff's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**, and Counts II-VII are **DISMISSED WITHOUT PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: January  5  , 2012                       s/ Richard H. Kyle
                                                RICHARD H. KYLE
                                                United States District Judge